**In re William C. GLENN and Mildred Glenn, Debtors.**

**Bankruptcy No. 88–1665.**

United States Bankruptcy Court, W.D. Pennsylvania.

June 6, 1989.

Pamela Pershing, Hyatt Legal Services, Monroeville, Pa., for debtors.

Owen Katz, Bernstein and Bernstein, P.C., Pittsburgh, Pa., for claimant.

Stephen I. Goldring, Asst. U.S. Trustee, Pittsburgh, Pa.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is Debtors' Objection to the claim of Bernstein and Bernstein, P.C. ("Bernstein"), for prepetition legal fees. Debtors dispute the characterization of the fee agreement and judgment notes, as well as the amount requested. A hearing was held at which time the parties provided both documentary and testamentary evidence. Having reviewed same, and the applicable law, we find the claim to be valid in the sum of $29,848.16, plus interest as delineated in the judgment notes.

## FACTS

Debtors were directors of New World National Bank ("Bank"), a minority-controlled financial institution. Mrs. Glenn holds two Masters Degrees, one of which is in Business Administration. She was previously employed for twelve (12) years as a teacher. She began her employment for the Bank as the head accountant and for two (2) years served as its President. Mrs. Glenn is presently employed as a librarian. Mr. Glenn attended a post-secondary trade

school and has owned and operated an electrical contracting company for many years. Despite his lack of formal education, Mr. Glenn is clearly and obviously an intelligent and astute businessman.

At some point in 1984 or early 1985, the Board of Directors learned that a brokerage firm sought to have the Bank's stock traded openly. Fearing a concomitant loss of minority control, the directors decided they would each purchase as much of the outstanding stock as they could afford. The Glenns, under unusual circumstances, borrowed money from the Bank, and with that loan purchased approximately twenty percent (20%) of the stock.

A majority of the other directors became concerned over the strength of position the Glenns had obtained. Shortly thereafter a disagreement arose among the directors regarding the future direction of the Bank. Debtors subsequently became embroiled in two confrontations: one with these directors over control of the Bank, and another with the United States Comptroller of the Currency regarding the underlying loan transaction. Debtors also faced the possibility of criminal charges regarding the stock loan.

The Debtors approached Joseph Bernstein in the early days of 1986 regarding legal representation in their stock loan and proxy fight. On January 10, 1986, both Debtors executed two (2) documents. The first was a Power of Attorney and Schedule of Fees. The document provided for hourly rates between $35 and $125, depending upon the service being performed and the party performing same. The schedule specifically anticipated the utilization of attorneys, associates, and paralegals. The document also stated that these hourly rates were subject to change.

In order to secure the payment of all fees and expenses the schedule contained several provisions:

(1) Debtors were to pay a $5,000.00 retainer within ten (10) days;

(2) Debtors were to pay for all expenses on a current monthly basis;

(3) Debtors were to execute a judgment note in the amount of $20,000.00; and

(4) Debtors were to make monthly payments against said note, with the minimum payment being $200.00.

The second document executed by the Debtors was the above-referenced $20,000.00 judgment note. The note refers (in capital letters) to the Power of Attorney and Fee Schedule, and restates the minimum payment of $200.00 per month. It also includes an interest rate of eight percent (8%), a provision for prepayment without penalty, and a confession of judgment clause.

The representation by the Bernstein firm continued through the first half of 1986 with substantial activity, including the filing of a derivative action against the controlling directors. Beginning in February 1986, a monthly billing statement was sent to the Debtors' home address. Said statement provided a detailed itemization of all services provided, the date performed, the initials of the performing party, and the time expended. From the outset the Debtors were delinquent in their agreed payments. The $5,000.00 retainer, which was to be paid by January 20, 1986, was not completed until April 21, 1986. No minimum monthly payments were made until April 30, 1986, at which time Debtors paid $600.00. The outstanding expenses of $177.50 had not yet been paid, and Debtors' outstanding balance due was $4,426.50. At the end of April the Bernsteins opened a separate file on the Debtors to deal only with the litigation involving the Comptroller of the Currency. Thereafter all billings were separated between these files as appropriate, and two monthly statements were sent to the Glenns.

By August 1, 1986 Debtors' total outstanding balance on these two (2) files was $28,448.20. No monthly payments toward this debt had been made since April of 1986. The Bernsteins advised the Debtors that their legal bills were mounting and it would be necessary for them to sign an additional judgment note for $15,000.00 to secure the payment of the fees. Said note, which was executed by both Debtors on August 19, 1986, was similar to the first.

The note again referred, in capital letters, to the Power of Attorney and Schedule of Fees, and the $200.00 minimum monthly payment. It also contained the provision for prepayment without penalty and a confession of judgment clause. This note additionally provided that all payments would first be applied to the original note. The interest rate on the second note dropped to six percent (6%) and called for payment in full by January 10, 1989.

The litigation involving the Comptroller of the Currency was settled by the Bernsteins in September of 1986. The original penalty assessment of $50,000.00 was reduced to $10,000.00. Additionally, the payment of said penalty would not be due until ninety (90) days after the *lis pendens,* filed against Debtors' residence, was released. The total outstanding balance on this file was and continues to be $5,392.27.

During this same time period, Debtors were indicted by the Justice Department in regard to their loan transaction and/or fiduciary responsibilities to the Bank. The issues in this criminal litigation were substantially similar to those being litigated civilly. As the factual determinations in the criminal action would be binding on the civil matters, the Bernsteins activities were substantially curtailed for several months. Debtors were advised by counsel that the standard of proof in the criminal matters was heavier than in the civil matters, and that if they were criminally convicted, the civil litigation would not be able to continue. A criminal conviction was obtained against both Debtors, and a subsequent appeal failed to bring a reversal or vacation.

At some point prior to March of 1987, the controlling directors responded to Debtors' derivative litigation by suing the Bernsteins for libel and/or slander. The Bernsteins were therefore faced with a substantial conflict of interest and advised the Debtors that the firm would need to obtain Court authorization to withdraw as counsel. Said Motion to Withdraw was filed in March of 1987. The Debtors testified to the understanding that the Bernsteins were obligated to continue in their representation until the Court authorized their withdrawal. The Bernsteins did so through November 25, 1987, when the Court orally granted their Motion. This was done simultaneously with the dismissal of the remaining civil litigation, which had been mooted by the criminal conviction. As of their withdrawal the Bernsteins were owed a total of $32,227.66, plus interest.

Debtors have raised numerous objections to the claimed amounts. First, they argue that they were given misleading assurances, *to wit:*

(1) Joseph Bernstein would personally handle the entire matter;

(2) The total cost to the Debtors for all litigation would not exceed $20,000.00; and

(3) the Bernsteins would follow through to the conclusion of the cases, including trial of the issues.

Debtors acknowledge the signing of the Power of Attorney and Schedule of Fees; they also acknowledge the signing of the two (2) judgment notes, which both refer to the Power of Attorney and Schedule of Fees. Both Debtors wavered on whether they read the documents before signing them, saying that they may have skimmed over them. These Debtors testified that they did not carefully peruse these documents because they relied on the "oral understanding".

Mrs. Glenn states that she never saw any of the monthly bills; and if any statements had come from the Bernstein office, she would have given them directly to Mr. Glenn. Mr. Glenn acknowledged the receipt of "a few" of the statements, but stated he disregarded them in reliance upon the original "oral understanding". Mr. and Mrs. Glenn both stated their belief that the fee arrangement was somehow contingent in nature; i.e. that the Bernsteins would only be entitled to the $20,000.00 if and when all of the litigation was satisfactorily completed.

At trial Mrs. Glenn also raised several objections to the actual bills, alleging that the attorneys had double billed, billed for excessive time, and had too many different people working on the case. In response to

the billing allegations, the Bernsteins' witnesses testified to keeping detailed contemporaneous time records, and cross-checking billings three (3) times before mailing statements. Joseph Bernstein testified that meetings between and among counsel were billed by only one (1) party. In many cases he avers to not billing at all for time spent.

## ANALYSIS

■ Under Bankruptcy Rule 3001(f), a proof of claim properly executed and filed constitutes prima facie evidence of both the validity and amount. A party objecting to said claim must produce evidence to rebut the claim or it will prevail. The mere denial of the validity or amount is not sufficient. However, if such evidence is produced to overcome the presumption of validity and/or amount, the claimant must produce additional evidence, and must prove the validity of the claim by a preponderance of the evidence. The ultimate burden rests with the creditor. *See Matter of Fidelity Holding Company, Ltd.*, 837 F.2d 696 (5th Cir.1988).

■ The evidence presented at trial is overwhelmingly in favor of the Bernsteins. We have, as written evidence, executed copies of the Power of Attorney and both promissory notes. These documents must be given their plain meaning unless the Debtors can provide some proof otherwise. The Power of Attorney specifically provides a fee schedule which indicates the rates to be charged for various professional services. It also explains that said rates are subject to change.

There is no indication that *all* work will be performed exclusively by Joseph Bernstein. In fact, such a provision would be highly inappropriate. It would be outrageous for the Debtors to pay $125.00 per hour for a senior attorney to perform a task such as copying documents, when a paraprofessional can accomplish the same thing for a substantially smaller hourly rate. Additionally, we note from the record that Mr. Glenn had numerous meetings with Mr. Bobinis, the lead litigator at Bernstein's firm. Mr. Glenn even directed correspondence to Mr. Bobinis, which indicates he knew that Mr. Bernstein was not the performing party in most of the litigation.

The two (2) promissory notes were also executed by both Debtors. No where in either note can we find *any* language indicating that the receipt of fees was somehow contingent. There is no language guaranteeing a positive outcome. There is no indication that the fee would be waived if counsel were forced to withdraw. Even if we interpreted the Debtors' rendition of the "oral understanding" to go forward to completion, Bernstein's office did in fact do so. The litigation with the Comptroller of the Currency was settled. A reduction of a penalty from $50,000.00 to $10,000.00 is a favorable result—even if the Glenns do not see it that way.

Furthermore, the Bernsteins did not withdraw from their representation until it was legally impossible to continue. The criminal convictions mooted any further civil litigation. The lawsuits were dismissed and the Bernsteins were permitted to withdraw. Therefore, the Bernsteins did go forward to completion.

Finally, there is no indication in any of the three (3) documents that fees would be limited to a specific dollar figure. Given the complexity of the legal issues before them, it would have been folly for counsel to give a set figure, be it $20,000.00 or any other.

We are hesitant to believe Debtors' testimony that they totally disregarded the language of the written documents in favor of some oral understanding. Debtors were far from ignorant. As stated previously, Mrs. Glenn has two (2) Masters Degrees—in Business and in Education. She worked as a teacher for a number of years and served as Bank President for two (2) years as well. Mr. Glenn owns his own contracting company. Both have had exposure to complex documentation, some of same "legal" in nature. We cannot believe that these two sophisticated individuals overlooked and/or ignored every shred of pertinent information provided to them.

Finally, we look to the amount of the claim as challenged by the Glenns. As a bankruptcy court we are often required to examine time records for duplication, double-billing, and other irregularities. We have carefully perused and compared all of the billing statements provided as exhibits. We have also taken into account the statements by Mr. Bobinis and Mr. Bernstein regarding cross checking and billing of only one lawyer's time even when two or more lawyers were involved. In our investigation we did find a handful of instances wherein two or three attorneys met together and the bill reflects charges for all. We are certain, given counsel's declarations on the stand, that said billings were in fact an oversight. We have taken the liberty of calculating the appropriate reduction. The claim will be reduced by $2,379.50 to $29,848.16, plus interest.

An appropriate Order will be issued.

### ORDER OF COURT

AND NOW at Pittsburgh in said District this 6th day of June, 1989, in accordance with the foregoing Memorandum Opinion of this date evenwith, it is hereby ORDERED, ADJUDGED and DECREED that the claim of Bernstein and Bernstein, P.C. be and is valid and allowed in the reduced sum of $29,848.16, plus interest as delineated in the judgment notes.