**In re SOUTH MOTOR COMPANY OF DADE COUNTY, et al., Debtors.**

**SOUTH MOTOR CHRYSLER–PLYMOUTH, INC., Plaintiff,**

v.

**CHRYSLER MOTOR CORPORATION, a/k/a Chrysler Corp., Defendant.**

Bankruptcy Nos. 91–14799–BKC–SMW to 91–14804–BKC–SMW, 91–14848–BKC–SMW and 91–14849–BKC–SMW. Adv. No. 92–1273–BKC–SMW–A.

United States Bankruptcy Court, S.D. Florida.

Nov. 10, 1993.

Michael I. Goldberg, Tew & Garcia–Pedrosa, Miami, FL, for South Motor Chrysler–Plymouth, Inc., debtor/plaintiff.

Kenneth E. Zeilberger, Schantz, Schatzman & Aaronson, P.C., Miami, FL, James

F.B. Daniels, Berman, DeLeve, Kuchan & Chapman, Kansas City, MO, for Chrysler Motor Corp., a/k/a Chrysler Corp., defendant.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge, sitting by designation.

These matters come before the Court on the two-count complaint filed by South Motor Chrysler–Plymouth, Inc. (the "Debtor") against Chrysler Motor Corporation a/k/a Chrysler Corp. (the "Creditor") seeking the alternative relief of specific performance or damages for alleged breach of a certain agreement (the "Agreement"). In addition, the Creditor's filed proof of claim to which the Debtor objected is at issue. Upon consideration of the pleadings and the evidence adduced at trial, the Court hereby denies the relief sought in the complaint by the Debtor. The Court sustains the objections to the Creditor's claim.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334(b). It has been referred to the Bankruptcy Court by the standing order of reference from the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 157(a). It is a core proceeding under 28 U.S.C. § 157(b)(2)(O), as admitted by the Creditor in the parties' joint supplementary brief and related stipulation. Therein the parties expressly waived the mandatory arbitration provisions contained in the Agreement. Both parties have agreed to the Court's subject matter jurisdiction, exercise of in personam jurisdiction over them, and to entry of a final judgment on the disputed issues of fact and law. The parties have also stipulated that venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1409(a), notwithstanding one of the provisions of the Agreement discussed below.

## II. NATURE OF THE MATTERS

The Debtor seeks judgment for damages claimed of $250,628.54, plus pre-judgment interest, costs and attorney's fees or specific performance. In its answer, the Creditor denies that it is liable for either form of relief requested, and has pleaded sixteen separate affirmative defenses. Among the affirmative defenses pleaded are: (1) set-off under 11 U.S.C. §§ 542(b) and 553(a); (2) that the Debtor failed to satisfy certain conditions precedent under the Agreement, including obtaining required release of liens and encumbrances, failure to deliver timely the property and assets subject to the Agreement for repurchase by the Creditor, and failure to timely tender the goods identified to the Agreement; and (3) that the Debtor is barred by the equitable doctrines of waiver, estoppel and laches. The heart of the Creditor's defense is that the Debtor has committed various breaches of the Agreement. The Creditor has also counterclaimed against the Debtor arguing the equitable doctrine of recoupment as a defense, in addition to the above statutory set-off claims. The Creditor seeks allowance of its filed proof of claim. It contends that the Debtor is liable for various credits on account owed by the Debtor to the Creditor.

In reply thereto, the Debtor has contended that the doctrines of set-off and recoupment are inapplicable for want of mutuality and failure to timely assert same; that the Creditor is barred by applicable statutes of limitation; and the Creditor is estopped by its own alleged breaches of contract to claim any recovery for the Debtor's alleged breaches. Further, the Debtor claims the Creditor has reaffirmed its obligations to the Debtor by promising to repurchase the subject goods, subsequent to the time that the Creditor claims the Debtor breached the Agreement, and thereby waived its rights thereunder.

The bankruptcy case and related adversary proceeding were originally assigned to the Honorable Sidney M. Weaver. On March 29, 1993, both matters at bar were tried before this Judge sitting in the Southern District of Florida by designation. Subsequently, counsel submitted post-trial pleadings, briefs and arguments. The Court then took the matter under advisement.

## III. FACTS AND BACKGROUND

Between 1987 and 1991, the Debtor was in the business of selling and servicing new and

used Chrysler manufactured automobiles and parts in south Florida. On September 30, 1987, the Debtor and the Creditor entered into the Agreement (a standard Chrysler sales and service agreement), containing various terms and provisions under which the Debtor was appointed as an authorized dealer of new Chrysler and Plymouth automobiles, parts, accessories, and related products. Active operations, however, ceased in the Fall of 1990. The following provisions are relevant for purposes of these matters.

Paragraph 28(a) of the Agreement provides:

[Debtor] may terminate this Agreement on not less than thirty (30) days written notice.

Paragraph 28(c) thereof concludes:

The obligations of the parties to this Agreement as set forth in Paragraphs ... 29 ... shall remain in full force and effect after the effective date of termination.

Paragraph 29 of the Agreement states, with certain exceptions not applicable here:

[Creditor] agrees to buy and [Debtor] agrees to sell, free and clear of any liens and encumbrances, within ninety (90) days after the effective date of any termination under Paragraph 28:

.  .  .  .  .

(b) All new, unused and undamaged ... parts that are priced and identified as eligible for return in [Creditor's] then current parts lists and that were purchased by [Debtor] from [Creditor] and are on the effective date of termination of the property of and in the possession, custody and control of [Debtor], at current listed prices (exclusive of transportation charges). [Creditor] shall add to such current listed prices (exclusive of transportation charges) an allowance of five percent (5%) of such prices for packing and crating by [Debtor] and a credit for transportation charges paid by [Debtor] to ship such parts to the destination [Creditor] designates. [Creditor] shall subtract from such current listed prices (exclusive of transportation charges) all maximum allowable discounts and the costs of any necessary refinishing, reconditioning or repacking to restore the parts to their original saleable condition, and [Creditor's] costs of determining whether such parts are free and clear of all liens and encumbrances. Prior to purchase by [Creditor], [Debtor] shall deliver the parts (tagged and inventoried in accordance with [Creditor's] instructions) for inspection F.O.B. at any point [Creditor] may designate. [Creditor's] determination of the quantity and value of the parts returned will be conclusive unless [Debtor] notifies [Creditor] in writing within 15 days of receiving the check or statement of account for such parts returned of any error made in such determination.

(c) All new, unused and undamaged [Creditor] accessories or accessories packages for the yearly model current at the effective date of termination, complete as supplied to and purchased by [Debtor] from [Creditor] during the twelve (12) months immediately preceding the effective date of termination and that are on the effective date of termination the property of and in the possession, custody and control of [Debtor] at the prices then applicable (less maximum allowable discounts) and current at the effective date of termination, exclusive of transportation charges. [Creditor] shall add to such currently applicable prices an allowance of five percent (5%) of such prices (less maximum allowable discounts) for packing and crating by [Debtor] and a credit for transportation charges paid by [Debtor] in shipping such accessories to the destination [Creditor] designates. [Creditor] shall subtract from such currently applicable prices (less maximum allowable discounts) the cost of necessary refinishing, reconditioning or repackaging of such accessories or accessories packages to restore them to their original salable condition and [Creditor's] cost of determining whether such accessories or accessories packages are free and clear of all liens and encumbrances. Prior to purchase by [Creditor], [Debtor] will deliver the accessories or accessories packages, tagged and inventoried in accordance with [Creditor's] instructions, for inspection F.O.B. at any point [Creditor] may designate. [Creditor's] determination of the quantity and

value of the accessories or accessories packages returned will be conclusive unless [Debtor] notifies [Creditor] in writing within 15 days of receiving the check or statement of account for such accessories or accessories packages returned of any error made in such determination.

Paragraph 39 of the Agreement provides: The waiver by either party of any breach or violation of or default under any provision of this Agreement will not operate as a waiver of such provision or of any subsequent breach or violation thereof or default thereunder.

Paragraph 42 of the Agreement provides: In the event of a dispute hereunder, the terms of this Agreement shall be construed in accordance with the laws of the State of Michigan.

*See* Exhibit No. 1, pp. 11–14, 18–19.

On August 27, 1991, the Debtor's president sent a letter to the Creditor providing notice of termination, pursuant to Paragraph 28 of the Agreement, to be effective thirty days upon receipt of the letter. *See* Exhibit No. 3. The following day, on August 28, 1991, one of the Creditor's zone managers responded by letter confirming the termination date would be effective September 27, 1991, and referencing the various repurchase conditions in Paragraph 29 of the Agreement. *See* Exhibit No. 4. The response mentioned the repurchase obligations for not only the parts and accessories at issue in this matter, but the new automobile inventory not at issue. The August 28, 1991 response contained detailed instructions concerning the parts and accessories, and transmitted a certain parts list inventory form (denominated "Parts Eligible For Return List"), which was to be completed in accordance with the detailed instructions. *See* Exhibit No. 2. In order to expedite the matter, the letter alternatively allowed the Debtor to submit data processing cards or magnetic tape in place of the completed parts list, but in a format in accordance with the enclosed parts list form. The response expressly stated that the list of all eligible parts and accessories wished to be returned must be timely furnished, and indicated in bold typeface, **"SUPPLEMENTAL INVENTORY LISTS WILL NOT BE AC-** CEPTED AFTER THE ORIGINAL LIST HAS BEEN RECEIVED." *See* Exhibit No. 4, p. 3. It further advised that after the Debtor's list of parts and accessories had been furnished and analyzed, and all liens against same had been cleared, the Debtor would be furnished specific shipping instructions. The Debtor was directed not to return any parts and accessories until receipt of the computer printout and item identification tags from the Creditor's parts depot. The response also noted that any transportation charges must be prepaid. *Id.* at pp. 2 and 3. Lacking an immediate reply from the Debtor, the Creditor's same zone manager directed a second response dated September 16, 1991, identical to the letter of August 28, 1991, but denominated a "SECOND NOTICE." *See* Exhibit No. 5.

Subsequent thereto, in September, 1991, the Debtor complied with the requisite conditions and documentation under Paragraph 29 of the Agreement for the Creditor's repurchase of the automobiles, but a completed parts list in the form as requested in the Creditor's letters of August 28, 1991 and September 16, 1991 was not submitted. The alternatives of furnishing data processing cards or magnetic tape were not sent. Instead, because the Debtor previously had the parts and accessories inventoried in the Fall of 1990, the results of which were input into the Debtor's own computer data base, from that data base a "counter-pad" was printed on September 16, 1991. The counter-pad for the parts and accessories was a computer generated list of parts showing their location, cost, and number of units. This counter-pad was sent by the Debtor, rather than the completed form sent by the Creditor, because the Debtor had several thousand parts and it was an enormous task to type all required data onto the printed form. The Debtor allegedly sent the counter-pad with a letter dated September 20, 1991, to the Creditor's zone manager, containing the listing of the automobiles. *See* Exhibit No. 16. The letter was received on September 23, 1991, but the Creditor's records contain no receipt or record of that counter-pad. Another similar counter-pad dated September 16, 1991, which was introduced at trial, containing

highlighted markings, was never sent to the Creditor. *See* Exhibit No. 6.

The total amount of parts and accessories inventoried on Exhibit 6 exceeded $265,000.00 at Debtor's cost, but included some items not purchased from the Creditor. Benjamin Blankenship, the Debtor's Chief Financial Officer, opined that the value of the subject parts at the time of trial was approximately $25,000.00 on a distress sale basis. According to Jesse Harris, the individual who had conducted the Debtor's 1990 parts inventory, the counter-pad was sent in lieu of the form supplied because it was thought to be redundant, time consuming, and expensive to complete the required form rather than merely send the counter-pad. Harris testified that he and Blankenship had talked with either Bill Sedlak, a Service Zone Director of the Creditor, or Harris had phoned Bill Norman, a District Service Manager of the Creditor, who approved sending the counter-pad in lieu of sending the completed parts list form. The Creditor, however, denies receiving any counter-pad or the substantial equivalent of Exhibit 6 in September, 1991. Norman expressly denied in this testimony that any such verbal authorization was granted by him. It is undisputed, however, that the Debtor did not transmit a completed parts inventory form as required in the Creditor's letters of August 28, 1991 and September 16, 1991. Also, the Debtor did not submit the alternative media containing all the required information for the parts and accessories on data processing cards or magnetic tape.

The counter-pad sent by the Debtor, as well as Exhibit 6, was not the product of another physical inventory of the parts and accessories. The counter-pad did not show which parts were damaged or which ones were eligible for repurchase by the Creditor in September, 1991. Moreover, the counter-pad did not show the year of the accessories or parts; whether same had been purchased within the prior year; or reference the applicable discounts, repacking or reconditioning charges incidental to delivery of same to the Creditor. The notes on Exhibit 6 show sales of parts from the Debtor's inventory rather than purchases thereof from the Creditor. Steven Hartsell, one of the Creditor's Senior Auditors, testified that Exhibit 6 was not reliable because parts purchased into and subsequently sold from the inventory were not accurately posted or properly balanced with the parts on hand reflected in the counter-pad.

On October 4, 1991, in response to a foreclosure action commenced by the Debtor's floor plan financier, First Union National Bank of Florida ("First Union"), the Debtor and eight affiliated corporate entities filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida. At that time neither the Debtor nor the Creditor had performed all their respective obligations under Paragraph 29 of the Agreement, although its termination date had previously been effective on September 27, 1991. On October 9, 1991, the Debtor filed an emergency motion for approval of the sale of the Chrysler automobiles to the Creditor in order to consummate their resale as provided for under Paragraph 29 of the Agreement. *See* Exhibit No. 7. The motion alleged that First Union had consented to the sale of the automobiles, and agreed to release its lien upon same in exchange for the purchase price to be paid by the Creditor. The motion made no reference to the resale and repurchase of the parts and accessories.

Thereafter, on October 10, 1991, Judge Weaver conducted an expedited hearing on the emergency motion. He entered an order authorizing resale by the Debtor to the Creditor of the automobiles, and authorizing the Creditor to directly repay First Union, which would and did release its lien on the automobiles upon payment of those repurchase prices. *See* Exhibit No. 8. The Creditor did not oppose the Debtor's motion or entry of the order granting same. Inspection of the automobiles occurred later in October, 1991, and on November 13, 1991, the Creditor paid in full for the automobiles within the ninety-day period from and after the termination date of September 27, 1991, pursuant to Paragraph 29 of the Agreement. Unfortunately, like the motion, the order did not contain a provision for the resale and repurchase of the parts and accessories.

At no time thereafter did the Debtor file a separate motion to sell the parts and accessories to the Creditor either prior to or after the expiration of the ninety-day period from and after the effective date of termination of September 27, 1991 under the Agreement. Nor did the Debtor file any motion to assume the Agreement as an executory contract. First Union also held a lien against the Debtor's inventory of the parts, accessories and accessory packages. Although, First Union released its lien against the automobiles, it did not agree to release its lien on the parts and accessories until February 18, 1992, according to one of its attorneys' testimony. *See also* Exhibit No. 9. First Union was wary of releasing its lien on the parts and accessories because the Creditor might not buy all of same.

During Spring and Summer of 1992, counsel for the Debtor, Creditor, and First Union exchanged correspondence and telephone messages. The Creditor was asked to send identification tags so that the repurchase process could be completed. *See* Exhibit Nos. 9, 10 and 14. On August 24, 1992, Hurricane Andrew damaged the Debtor's premises destroying much property, but not extensively damaging the building containing the parts. In order to prevent looting, however, the parts were moved within the building to make room for other parts. Restacking resulted in some damage. Senior staff counsel for the Creditor responded to counsel for the Debtor and First Union under date of August 31, 1992, noting that the inventory forms received were over nine months old and that the Creditor had significant concerns about the condition of the parts, and suggested scheduling a mutually agreeable time to inspect the parts. *See* Exhibit No. 15. He advised that appropriate parts division personnel could give a quick answer concerning the acceptability of any parts sought to be returned, but expressly reserved any defense in subsequent litigation. *Id.* Prior thereto, Norman, among others, photographed and inspected the parts on October 8, 1992, (Group Exhibit No. 15), and again on November 4, 1992.

The photographs depict that some of the parts were in disarray, indicating evidence of damage to both packaging and contents. Many packages were open, some crushed, and some parts were lacking numbers. Norman testified that others were unwrapped and some temperature sensitive parts had not been stored in climate controlled conditions. During the subsequent November 4, 1992 inspection, though the parts had been rearranged into better order, Norman testified that their physical condition was substantially unchanged. Norman inspected a sample of the parts listed on the counter-pad against what was then on hand. He noted a number of irregularities, including parts not listed on the counter-pad, rusted parts, missing parts, damaged packaging, and open packaging. Thus, he concluded many of the parts were damaged and unusable at the time of his inspections, and therefore ineligible for repurchase or return, and of little value. He also testified that on the account owed by the Debtor to the Creditor, there was a net balance owing and unpaid of $11,652.50 as of the petition date.

The Debtor's plan of reorganization was confirmed on September 4, 1992. It provided that only certain other dealer or franchise agreements were assumed under Article IX thereof. Article 9.3 provided that all other executory contracts would be deemed rejected. The parties were unable to negotiate any resolution of the parts and accessories, which the Debtor still desired the Creditor to repurchase pursuant to the Agreement. The Debtor then filed the instant complaint.

## IV. *ARGUMENTS OF THE PARTIES*

### A. *The Debtor's Main Points*

The Debtor advances various arguments in support of its theory that the Creditor breached the operative provisions of Paragraph 29 of the Agreement. The Debtor contends that the Creditor did not raise the affirmative defense that the Debtor failed to assume the Agreement under 11 U.S.C. § 365, until its post-trial submissions, and therefore that argument has been waived. According to the Debtor, because Paragraph 29 was a part of the Agreement, and had been terminated pre-petition, the Debtor could not assume it under section 365. Furthermore, Paragraph 29 is not a separate or

severable contract, but merely one portion of the underlying Agreement. The Creditor has acknowledged such lack of severability of Paragraph 29 by asserting its recoupment counterclaim. Moreover, the Debtor argues that Paragraph 28 of the Agreement specifically provides that obligations to the parties, as set forth in the Agreement, shall remain in full force and effect after the effective date of the termination of the Agreement.

In addition, the Debtor argues that anti-waiver provisions of Paragraph 39 of the Agreement do not preclude the effective waiver by the Creditor of the benefits of Paragraph 29. On this point, the Debtor contends that until suit was filed, the Creditor never formally apprised the Debtor that it was in default under the Agreement. Moreover, the Debtor contends that the letter dated August 31, 1992, from the Creditor's in-house counsel, evidences the Creditor's waiver by the statement contained therein indicating that the Creditor was agreeable to inspecting the parts at a mutually agreeable time. Therefore, the Creditor has waived the benefits of the time provisions regarding completion of the repurchase in Paragraph 29.

According to the Debtor, the counter-pad it timely sent in September, 1991, contained most of the information required by the Creditor's form. Accordingly, the Creditor breached the Agreement by failing to furnish the necessary tags and shipping instructions for the parts and accessories sought to be resold by the Debtor to the Creditor. Next, the Debtor argues that the Agreement itself in Paragraph 29 permits the satisfaction of the lien encumbering the parts and accessories to be satisfied at closing, and that the nature of the business relations between the parties made it impractical to apply the Creditor's construction of Paragraph 29 to require First Union's lien encumbering the parts and accessories be released prior to closing. According to the Debtor, before the alleged breach by the Creditor, the parts were in good and resaleable condition. Under the applicable provisions of the Uniform Commercial Code, after the Creditor's breach, the risk of loss shifted to it, as purchaser of the parts, because the parts were identified to the Agreement, and were conforming thereto, to the extent not covered by insurance. The Debtor's loss occurred within a reasonable time from the alleged breach committed by the Creditor.

Furthermore, the Debtor contends that the equities mandate that the Creditor, rather than the Debtor or its other creditors, bear the loss, and that the Creditor should be estopped to repudiate its repurchase obligations because its delays made the parts and accessories obsolete due to the Creditor's delay in performance under Paragraph 29. The Debtor notes that the Court should apply Michigan law pursuant to the provisions of Paragraph 42 of the Agreement.

## B. *The Creditor's Main Points*

The Creditor raises numerous arguments in defense. Although the Debtor substantially and timely complied with the requirements of Paragraph 29 of the Agreement regarding the repurchase of the automobiles, it did not do so for the parts. The reply from the Debtor did not include a completed parts inventory form containing all the required information. Further, the Debtor did not alternatively forward the data processing cards or magnetic tape as noted by the Creditor in its responses of August 28, 1991 and September 16, 1991. All these alternatives required an actual contemporaneous physical inventory of the parts and accessories, which was admittedly not done. Therefore, the Debtor never complied with the critical initial step required under Paragraph 29.

The Creditor next argues that Paragraph 29 was a separate executory contract that survived the termination date of the Agreement, and was required to be assumed by the Debtor pursuant to 11 U.S.C. § 365, prior to the expiration of ninety days from and after the date of termination of the Agreement. The Debtor, however, failed to file any motion to assume such executory contract as required by section 365 and Federal Rule of Bankruptcy Procedure 6006, but rather effectively rejected same in its confirmed plan of reorganization.

According to the Creditor, the Debtor finally elected its remedy at trial claiming damages for breach of contract under the applicable version of Section 2–703 of the

Uniform Commercial Code, and failed to timely seek specific performance. Thus, if any relief is available to the Debtor, it would only be able to recover the "price" per the applicable version in Section 2–709 of the Uniform Commercial Code as prescribed under Paragraph 29. The Creditor never accepted the goods, and therefore, the risk of loss of damage, which did not occur within a reasonable time, never passed to the Creditor. No acceptance ever occurred on the part of the Creditor under Section 2–606 of the Uniform Commercial Code because the Creditor was never in physical or constructive possession of any of the parts. Moreover, there never was a conforming tender made pursuant to Sections 2–503, 2–504 or 2–507 of the Uniform Commercial Code. Furthermore, there has been no showing that the Debtor is unable to resell the parts and accessories or mitigated its claimed damages.

According to the Creditor, the Debtor's alleged transmittal of a counter-pad in September, 1991, was inadequate performance of the Debtor's required conditions precedent to the Creditor's repurchase obligations. The counter-pad does not show which items in the parts inventory of the Debtor were new, unused, undamaged, priced as eligible for return under the then current price list or the prices thereof, and it did not show any repacking, transport, applicable discounts, refinishing or reconditioning costs. In addition, the Creditor argues that there was no tender of any lien release by First Union for the parts within ninety days of September 27, 1991.

The Creditor also argues that the Debtor has failed to show the amount of its contract-market differential as required under Section 2–708 of the Uniform Commercial Code, nor shown any difference between the unpaid contract price and the market price at the time and place of tender as is required by Section 2–723(2) of the Uniform Commercial Code. By reason of the Debtor's failures, the Debtor has effectively repudiated the Agreement under Section 2–609 of the Uniform Commercial Code. The Creditor contends it is entitled to cancel the repurchase obligations under Paragraph 29 of the Agreement, triggering the Creditor's cancellation rights under Section 2–711 of the Uniform Commercial Code.

The Creditor argues it is not subject to waiver or estoppel, but it is entitled to rely on the non-waiver provisions of Paragraph 39 of the Agreement. The Creditor contends that the Debtor is estopped by its own failures to perform the conditions precedent to the Creditors obligations to repurchase under Paragraph 29. According to the Creditor, the Debtor was required to timely resell to the Creditor within ninety days of the Agreement's effective termination date, all new, unused, and undamaged Chrysler parts and accessories. They had to be priced and identified as eligible for return in the Creditor's then current part list supplied by the Creditor to the Debtor, and had been sold to the Debtor within the preceding twelve months. Paragraph 29 required the Debtor within that ninety-day period to deliver such goods, properly tagged and inventoried in accordance with the shipping directions of the Creditor, F.O.B. to any point the Creditor might have designated. Only then would the Creditor's repurchase obligation arise upon receipt of delivery after inspection, and the repurchase price would be determined by it based on the value and quantity of the parts timely delivered under the terms of the Agreement. Lacking any substantial performance by the Debtor within the ninety days after September 27, 1991, the Creditor argues its repurchase obligations ceased. With regard to the choice of law point, although the Creditor admits Michigan law is referenced in the Agreement, and would apply on disputed matters dealing with its execution and interpretation, Florida law should control on the matters pertaining to the Agreement's performance and breach of the Debtor's obligation to the Creditor to resell, package, ship, and deliver the parts. The Creditor concludes that the complaint should be dismissed.

## V. DISCUSSION

### A. THE DEBTOR BREACHED THE AGREEMENT

■ The above-emphasized portions of Paragraph 29 of the Agreement provide that with respect to the parts and accessories, the

542

Creditor agreed to repurchase, and the Debtor agreed to resell, the goods under certain terms and conditions: (1) all new, unused and undamaged Chrysler manufactured parts and accessories; (2) that were free and clear of any liens and encumbrances; (3) within the ninety-day period after the effective date of the termination of the Agreement (from September 28, 1991 to December 26, 1991); (4) as priced and identified as eligible for return in the Creditor's then current parts list; (5) that were previously purchased from the Creditor by the Debtor; (6) that were on the effective termination date property of and in the possession of the Debtor; (7) at the current listed prices (exclusive of transportation charges); and (8) subject to a credit for transportation costs and a five percent allowance for packing and crating to be paid by the Debtor to ship such parts to the destination the Creditor designated. Most of these terms and conditions were conditions precedent which the Debtor had to satisfy prior to the Creditor's obligation to repurchase the goods.

The evidence is undisputed that the second, third and fourth conditions were not fully or substantially satisfied by the Debtor within the ninety-day period after the effective date of termination of the Agreement. First Union's lien was not released out of sale proceeds or otherwise, within the ninety-day period. The evidence does not show that all the parts and accessories were in fact purchased by the Debtor from the Creditor. None of the goods were shipped to the destination designated by the Creditor in its letters of August 28, 1991 and September 16, 1991 within the ninety-day period. Undisputedly, the Debtor did not make a timely tender of the goods at the destination designated in the Creditor's responses of August 28, 1991 and September 16, 1991. In that time frame, the preponderance of the evidence shows that the parts were new, unused and undamaged. What damage did occur transpired long after the ninety days had run. Hurricane Andrew struck Miami the following summer. There is no substantial dispute that the parts were, on the effective termination date of the Agreement, property owned by and in the possession of the Debtor.

The Debtor's evidence has failed to show which items of the parts referenced in the counter-pad were appropriately priced, identified as eligible for return in the Creditor's then current parts list, or which parts were purchased by the Debtor from the Creditor. The counter-pad did not show what the then current listed parts prices were. Rather, it showed the Debtor's cost of the parts. The Creditor is entitled to advance its own interests under the Agreement, and is not required to put the interests of the Debtor or its other creditors first. *See generally Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351, 1358 (7th Cir.1990).

The Debtor argues its sending the counter-pad was the functional equivalent of the permitted alternate furnishing of a magnetic tape. The Court rejects this conclusion. Although the counter-pad may have been a printout of data contained in the Debtor's computer, it is not a magnetic tape containing substantially all the information required by the parts list form sent by the Creditor to the Debtor. The Court disagrees with the Debtor that submission of the counter-pad was an immaterial deviation from the Agreement, insufficient to constitute a breach of the Agreement. The counter-pad was not the product of a recent physical inventory of the parts and accessories done at or near the date of termination of the Agreement, and it did not contain all required information. To the contrary, the evidence indicated that the counter-pad was a product of a physical inventory performed many months prior thereto, in the previous year after the Debtor ceased new car sales operations of Chrysler products. Hence, the failure of the Debtor to substantially perform the conditions precedent under the Agreement within ninety days after September 27, 1991, excused the Creditor from its repurchase obligations under the Agreement. Even if there was convincing evidence that the counter-pad was an acceptable alternative to the approved list, there were other conditions precedent—obtaining First Union's agreement to release its lien and performance within ninety days after termination—within the Debtor's that were not satisfied. Plus, approval of the sale by the bankruptcy court was required.

The Debtor also argues that the Creditor's failure to send the identification tags when requested constitutes inexcusable delay, and thus equity dictates that the Creditor should bear the loss, not the Debtor. The information contained on the counter-pad was insufficient to enable the Creditor to complete the tags under the Agreement, thus there was no inexcusable delay on the part of the Creditor. The Court will not rewrite the Agreement between the parties. The Debtor seeks damages or specific performance as alternate forms of relief, not reformation of the Agreement. The Court, in fairly construing the Agreement, finds that the Debtor did not comply with all conditions precedent, and thus is not entitled to the relief sought. The equities do not militate in favor of the Debtor.

**B.** *THE FILING OF THE BANKRUPT-*
   *CY PETITION DID NOT EXTEND*
   *THE TIME FOR PERFORMANCE*
   *UNDER THE AGREEMENT*

■ The parties focus on whether the filing of the Debtor's bankruptcy petition extended its time for performance under the requirements of Paragraph 29 of the Agreement. Section 108(b) of the Bankruptcy Code provides in relevant part that if an agreement provides a period within which a debtor may cure a default or perform any other similar act, and such period has not expired before the date of the filing of the bankruptcy petition, the trustee (or in this case, the Debtor acting as Chapter 11 debtor-in-possession) may cure or perform before the later of: (1) the end of such period, including any suspension of such period occurring on after the commencement of the case; or (2) sixty days after the order for relief. 11 U.S.C. § 108(b). The sixty-day extension provided the Debtor under section 108(b)(2), did not extend the Debtor's period of time under the provisions of Paragraph 29 to complete its substantial performance of all conditions precedent to the Creditor's obligation to repurchase. The ninety-day period under the Agreement after its effective termination date was past the sixtieth day after the order for relief. The scope of section 108(b)'s application is intended to augment non-bankruptcy established time limits. It

affords sixty days to take other actions not covered under subparagraph (a), unless the period for doing the relevant act expires later than sixty days after the date of the order for relief. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 318 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 30–31 (1978). *See In re Martinson,* 731 F.2d 543 (8th Cir.1984) (section applies to a debtor-in-possession); *In re Flying "S" Land & Cattle Co.,* 71 B.R. 183 (Bankr.D.Nev.1987). *See generally 2 Collier on Bankruptcy,* ¶ 108.03 (15th ed. 1993).

■ Unfortunately for the Debtor, not all the above-referenced conditions precedent to the Creditor's repurchase obligations were substantially completed either within the sixty-day period following the filing of the petition and the order for relief (October 5, 1991 to December 4, 1991), or the ninety-day period from the effective date of termination of September 27, 1991 (September 28, 1991 to December 26, 1991). Accordingly, this statutory provision is of no benefit to the Debtor. The bankruptcy court cannot enlarge or increase a debtor's property, or rewrite the terms of an executory contract. *See In re Lauderdale Motorcar Corp.,* 35 B.R. 544, 548–549 (Bankr.S.D.Fla.1983).

**C.** *THE CREDITOR DID NOT WAIVE*
   *ITS RIGHTS UNDER THE*
   *AGREEMENT*

The Court rejects the Debtor's argument that the preponderance of the evidence shows that the Creditor waived or is estopped to stand on its rights under the Agreement in requiring the Debtor to complete the form. First, the non-waiver provisions of Paragraph 39 buttress the Creditor's position on this issue. Second, the Creditor's agreement to subsequently inspect the parts in 1992, to perhaps seek a resolution of the repurchase dispute, does not constitute an effective waiver of the Debtor's prior defaults under the Agreement. Exhibit 15 clearly contains an express reservation of any defenses in the event of subsequent litigation.

■ Waiver is a voluntary relinquishment of a known right or privilege. *Florida House of Representatives v. U.S. Depart. of Commerce,* 961 F.2d 941, 946 (11th Cir.1992).

Waiver requires three elements: (1) the existence at the time of a waiver, of a right, privilege, advantage or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit. No evidence shows any intent by any agent of the Creditor to waive substantial compliance by the Debtor with all conditions of Paragraph 29. The evidence viewed as a whole compels the Court to conclude that there was no actual or constructive knowing waiver by the Creditor of its rights under Paragraph 29 to insist upon substantial performance by the Debtor in a timely fashion of those conditions precedent to its obligation to repurchase the parts. Because the Court concludes that the Creditor is not liable for the claimed breach of Paragraph 29, it need not discuss the damage issues raised or further discuss the Creditor's alternative defenses of set-off and recoupment.

### D. THE CREDITOR IS NOT BARRED UNDER THE DOCTRINE OF LACHES FROM REPUDIATING ITS REPURCHASE OBLIGATION

■ The Debtor argues that under the doctrine of laches, the Creditor is barred from repudiating its repurchase obligation pursuant to the Agreement because its delay in performance under Paragraph 29 made the parts and accessories obsolete. Laches is an equitable doctrine committed to the sound discretion of the Court. *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1516 (11th Cir. 1984). The defense of laches requires proof of three elements: (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that the delay caused the defendant undue prejudice. *Id.* at 1517, citing *Environmental Defense Fund, Inc. v. Alexander,* 614 F.2d 474, 478 (5th Cir.1980), *cert. denied,* 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980). The test for laches is flexible, requiring a careful examination of both the delay and the prejudice caused by that delay. *Conagra,* 743 F.2d at 1517, citing *Citibank, N.A. v. Citibanc Group, Inc.,* 724 F.2d 1540, 1546 (11th Cir.1984). In a footnote, the *Conagra* court noted that the laches defense consists of two types of cases: one in which the plaintiff's delay has been so outrageous, unreasonable, or unexcusable as to constitute virtual abandonment, and a second, more common situation, in which the delay is not so unreasonable and the defendant must show the type of prejudice leading to estoppel. 743 F.2d at 1517 n. 15.

■ The matter at bar falls into the second class of cases and thus the above-listed factors properly govern the analysis of this doctrine. The Court finds that laches is inapplicable here. The Creditor was justified in repudiating its repurchase obligation because the Debtor failed to substantially perform the conditions precedent under the Agreement within ninety days after September 27, 1991. Accordingly, the Creditor was rightfully excused from performing its repurchase obligation. Consequently, the Creditor's delay was excusable, and thus the doctrine of laches is inapplicable.

### E. THE CREDITOR IS NOT BARRED UNDER THE DOCTRINE OF ESTOPPEL FROM ASSERTING A BREACH OF THE AGREEMENT

■ The Debtor also maintains that the Creditor is barred under the doctrine of estoppel from asserting that the repurchase procedures the Debtor followed regarding the parts were unacceptable because similar steps were taken with respect to the automobiles, and the Creditor never objected. The doctrine of equitable estoppel "precludes a litigant from asserting a claim or defense that might otherwise be available to him against another party who has detrimentally altered his position in reliance on the former's misrepresentation or failure to disclose some material fact." *Federal Deposit Ins. Corp. v. Harrison,* 735 F.2d 408, 410 (11th Cir.1984). Estoppel requires the presence of three elements: "(1) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things; (2) willfulness or negligence with regard to the acts, conduct or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated." *United States, for Use of Krupp Steel Products, Inc. v. Aetna Ins. Co.,* 923 F.2d 1521, 1526 (11th Cir.1991), *citing Harrison,* 735 F.2d at 410;

*see also Dade County v. Rohr Industries, Inc.,* 826 F.2d 983, 989 (11th Cir.1987); *In re Garfinkle,* 672 F.2d 1340, 1347 (11th Cir. 1982).

■ The Debtor has not presented by a preponderance of the evidence all elements to invoke estoppel against the Creditor. Norman denied any conduct or consent to use of the counter-pad that would have led the Debtor to believe that the submission of the document constituted substantial performance of all its obligations under the Agreement, which were conditions precedent to the Creditor's repurchase obligation. There is insufficient evidence in the record to establish that the Creditor willfully or negligently acted under the Agreement to the detriment of the Debtor. Even if the Debtor relied, to its detriment, on the oral statements attributed to Sedlak or Norman concerning the counter-pad, the Debtor was unable to obtain First Union's consent to release its lien until the following year. The Debtor did nothing post-petition with respect to court approval of parts resale. The timely resale of the parts under the Agreement could have been effectuated in substantial compliance with the Agreement's terms and conditions, although the logistics governing the resale of the automobiles were less complicated than those governing the parts. More importantly, however, the Debtor fully complied with the Agreement's procedures on the automobiles within ninety days after termination of the Agreement. Same was not done with respect to the subject parts and accessories.

### F. CHOICE OF LAW ISSUE

The parties devote some time to issues which are not outcome determinative to the central focus in this matter of whether or not each party breached the relevant provisions of Paragraph 29. For example, notwithstanding the choice of law provision contained in Paragraph 42, the Creditor expends much argument on the point that Florida precedents should be considered because that was the place of contract performance and alleged breach. The issue of what jurisdiction's choice of law rule governs, and the supplemental questions as to whether that jurisdiction would enforce the law agreed to in the Agreement, and the additional issues of whether the proper choice of law rule in a bankruptcy case is federal or state, need not be resolved. The various Florida and Michigan authorities cited by the parties do not establish any substantial difference or conflict between the applicable contract breach rules between the two states. This conclusion is buttressed by the frequent parallel cites by defense counsel in the post-trial briefs to the relevant sections of the Florida and Michigan versions of the Uniform Commercial Code, with no noted substantial differences. Thus, the contractual stipulation concerning choice of law, which is ordinarily honored in bankruptcy matters, will not effect the outcome of the ultimate disputed issues concerning alleged breaches by the parties of the Agreement. *See generally* John T. Cross, *State Choice of Law Rules in Bankruptcy,* 42 Okla.L.Rev. 531 (1989).

### G. THE EXECUTORY NATURE OF THE AGREEMENT AND ITS ULTIMATE REJECTION IS NOT OUTCOME DETERMINATIVE OF WHETHER THE AGREEMENT WAS BREACHED

■ The parties also devote a substantial portion of their arguments to the undisputed fact that the Agreement was never expressly assumed by the Debtor pursuant to 11 U.S.C. § 365, but was rejected in the Debtor's confirmed plan of reorganization. That the Agreement was ultimately rejected and not assumed is not outcome determinative of whether the Creditor breached it. An executory contract has been defined as: "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *See* Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 460 (1973). Under section 365, a trustee or a debtor-in-possession may, subject to court approval, assume or reject an executory contract of the debtor. *See* 11 U.S.C. §§ 365(a) and 1107(a). "Rejection" constitutes a breach of the lease or contract by the debtor.

546

11 U.S.C. § 365(g). This rejection claim is treated as if it arose before the filing of the bankruptcy petition. 11 U.S.C. § 502(g). That rejection ultimately occurred here, however, does not answer the questions of whether the Creditor breached its repurchase obligation under Paragraph 29 of the Agreement, and whether prior to rejection, the Debtor breached Paragraph 29 by failing to timely complete its performance of conditions precedent to the Creditor's duties to repurchase. "Rejection" has been loosely and variously described in the cases as causing contract obligations to be:

(1) released— NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984);

(2) repealed— In re Stable Mews Associates, Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y.1984);

(3) reconsidered— In re Cleve, 3 Bankr.Ct.Dec. 1217, 1220 (Bankr.S.D.Cal. 1977);

(4) discharged or revoked— In re KMMCO, Inc., 40 B.R. 976, 977–978 (E.D.Mich.1984);

(5) repudiated— In re Chicago, R.I. & P.R. Co., 604 F.2d 1002–1004 (7th Cir. 1979);

(6) altered— In re TransAmerican Natural Gas Corp., 79 B.R. 663, 666 (Bankr.S.D.Tex.1987);

In re Silver, 26 B.R. 526, 530 (Bankr.E.D.Pa.1983);

(7) canceled— In re Allain, 59 B.R. 107, 108 (Bankr.W.D.La.1986); and

(8) avoided— In re Cherry, 78 B.R. 65, 69 (Bankr.E.D.Pa.1987).

■■■■■■ Another alternative view of what section 365 does and does not do, espoused by several scholars, merely treats rejection as the estate's decision not to assume the executory contract and therefore, rejection does not ipso facto terminate or otherwise end the contract. See Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo.L.Rev. 845 (1988); Jay Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn.L.Rev. 227 (1989); Michael T. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook*, 62 U.Colo.Rev. 1 (1991). Professors Andrew and Westbrook note that the concept of rejection was created to protect the bankruptcy estate from inadvertently becoming administratively obligated on the debtor's pre-petition contracts and leases. Under the Bankruptcy Code, administrative claims receive a higher priority for payment than pre-petition unsecured claims under 11 U.S.C. § 726(a). Thus, the bankruptcy estate is only liable to pay as an administrative claim on the contract of the debtor if that liability is expressly assumed, which then becomes elevated to administrative claim status. *See e.g.* Andrew, *supra*, at 881–882; Westbrook, *supra*, at 231, 330. Claims of parties to contracts that are rejected under sections 365(g) and 502(g) are treated as pre-petition unsecured claims, and therefore do not have priority over the claims of other administrative creditors. Both Professors note that the effect of rejection is to give rise to a remedy in the non-debtor party for breach of the rejected contract. This remedy is typically a right to money damages assertible as a general unsecured claim in the bankruptcy case. *See* Andrew, *supra*, at 866–878, 881–882; Westbrook, *supra*, at 230, 250, 355. Moreover, this view espoused by both Professors Andrew and Westbrook, and shared by this Judge, holds that rejection has absolutely no effect upon a contract's continued existence. The contract is not otherwise canceled, repudiated, or in any other fashion terminated. *See* Andrew, *supra*, at 884–889; Westbrook, *supra*, at 239. Accordingly, rejection of an executory contract does not ipso facto terminate rights and obligations that arise from rejected contracts. Andrew, *supra*, at 901–931; Westbrook, *supra*, at 257–263, 269, 308–310.

■■■■ Thus, under the Countryman definition of an executory contract, Paragraph 29 of the Agreement was executory because as of the time of the filing of the bankruptcy petition, there remained performance owing on both sides, and breach by one side could excuse the remaining performance by the other. The executory nature of the terminated Agreement is not outcome determinative of the ultimate question of whether under the acts and omissions of the parties here, there was a breach of the underlying repurchase obligation by the Creditor. The additional questions of whether or not the provisions of Paragraph 29 are severable, (which they are not) and whether or not

547

Paragraph 29 constitutes a separate contract (which the Court finds it is not), are also irrelevant to the issue of whether or not the terms of Paragraph 29 were breached by the Creditor or by the Debtor prior to rejection in the confirmed plan of reorganization. Regarding automobile dealer agreements, "until the contract ... is rejected or validly terminated ... the Debtor is entitled to compel specific performance and require the [Creditor] to abide by the provisions of the [Agreement]." *In re Chick Smith Ford, Inc.*, 46 B.R. 515, 519 (Bankr.M.D.Fla.1985). In this matter, however, not only was the Agreement ultimately rejected by the Debtor, but the Debtor failed to substantially perform the Agreement's conditions precedent to the Creditor's repurchase obligations.

## H. THE DEBTOR'S OBJECTIONS TO THE CREDITOR'S PROOF OF CLAIM ARE SUSTAINED

█ When a creditor files a proof of claim executed in accordance with the Bankruptcy Rules, that proof of claim constitutes prima facie evidence of its validity and amount, Federal Rule of Bankruptcy Procedure 3001(f); *In re Kham & Nate's Shoes, No. 2, Inc.*, 97 B.R. 420, 424 (Bankr.N.D.Ill. 1989); *In re Fogelberg*, 79 B.R. 368, 372 (Bankr.N.D.Ill.1986), unless the debtor or other party in interest objects. 11 U.S.C. § 502(a).

█ The prima facie validity of a properly filed proof of claim places the burden on the objector to introduce evidence rebutting this presumption. *In re Fidelity Holding Co.*, 837 F.2d 696, 698 (5th Cir.1988); *In re Schaumburg Hotel Owner Ltd. Partnership*, 97 B.R. 943, 950 (Bankr.N.D.Ill. 1989); *In re Chapman III*, 132 B.R. 132, 143 (Bankr.N.D.Ill.1991). Filing an objection to the claim without more is insufficient to overcome the rebuttable presumption. *In re Glenn*, 100 B.R. 763, 766 (Bankr.W.D.Pa. 1989). Once the objector has produced some evidence disputing the validity of a claim, the burden shifts to the claimant. *In re Missionary Baptist Foundation*, 818 F.2d 1135, 1143–1144 (5th Cir.1987); *In re Lampert*, 61 B.R. 785, 787 (Bankr.W.D.Wis.1986). The Creditor as the claimant, not the Debtor as the objector, bears the ultimate burden of establishing a valid claim by a preponderance of the evidence. *In re All–American Auxiliary Assoc.*, 95 B.R. 540, 544–545 (Bankr.S.D.Ohio 1989); *In re Farmers' Co-op. of Arkansas & Oklahoma, Inc.*, 43 B.R. 619, 620 (Bankr. W.D.Ark.1984).

█ Norman's testimony regarding excess credits issued in error by the Creditor to the Debtor was not based on any personal knowledge by Norman about how the amount was computed and exactly what it was for. He testified the amounts owed are different than those contained in the filed proof of claim. *See* Exhibit No. 23. The proof of claim references an amount claimed due from a previous statement which is not attached, nor explained by any testimony from the Creditor. On rebuttal, Blankenship testified that he had not previously seen the filed proof of claim, and that it is unsupported by underlying documentation establishing such claimed liability, and thus was disputed by the Debtor. On such evidence, the Court finds that the Creditor has not carried its burden to prove the claimed debt and the amount owing by a preponderance of credible and corroborated evidence. Therefore, the Debtor's objection to allowance of the filed proof of claim is sustained.

## VI. CONCLUSION

For the foregoing reasons, the Court hereby enters judgment for the Creditor. The complaint of the Debtor is dismissed. The Debtor's objections to the Creditor's proof of claim are sustained.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order will be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

## ORDER

For reasons set forth in a Memorandum Opinion dated the 10th day of November, 1993, the Court hereby denies the relief sought in the complaint by South Motor Chrysler–Plymouth, Inc. against Chrysler Motor Corporation. The Court sustains the

objections to the claim of Chrysler Motor Corporation.